UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL M. CAMPBELL,

                  Plaintiff,                Case No. 08-cv-11651

vs.                                DISTRICT JUDGE VICTORIA A. ROBERTS
                                MAGISTRATE JUDGE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.
===========================/

## REPORT AND RECOMMENDATION

## I.    BACKGROUND

Daniel M. Campbell brought this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision that Plaintiff was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed motions for summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

### A.    Procedural History

Plaintiff filed an application for DIB in March 2005, alleging that he became disabled on August 12, 2004, due to back pain (R. 73-77, 110).  After Plaintiff's application was denied upon initial review, an administrative hearing was held on January 30, 2006, at which Plaintiff was represented by his present attorney, Louis Weir (R. 269-303).  Vocational Expert ("VE") Norman Abeles, Ph.D., also testified (R. 297).

In a February 17, 2006, decision, Administrative Law Judge ("ALJ") Patricia Hartman found that Plaintiff was not disabled because there were a significant number of jobs in the national economy that he could perform (R 38-52). On October 13, 2006, the Appeals Council granted review, vacated the February 17, 2006, decision, and remanded the case so that the ALJ would give further consideration to the treating source opinion, further evaluate the Plaintiff's subjective complaints and, if warranted, obtain supplemental evidence (R. 213-215).

On April 30, 2007, a second hearing took place before ALJ Hartman (R. 304-335). Plaintiff was again represented by his present attorney, Louis Weir (R. 304). Vocational Expert Sandra Steele also testified (R. 329). On July 27, 2007, the ALJ issued a decision, concluding again that Plaintiff was not disabled because a significant number of jobs existed in the national economy that he could perform (R. 15-29). On approximately March 6, 2008, the Appeals Council denied review of the ALJ's decision (R. 5-7), at which time the July 27, 2007, decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

### B.     **Background Fact**

Plaintiff was 45 years old on August 12, 2004, when he alleges he became disabled by back pain (R. 73). In the year preceding the onset of his alleged disability, Plaintiff worked as an automotive prototype mechanic (R. 85-93). During approximately seven months of that employment, Plaintiff did not report to work, claiming his medical condition prevented him from doing so (R. 280). Prior to working as a prototype mechanic, Plaintiff worked as an automotive mechanic, a shipping leader, and a crane operator (R. 85-93).

    **1.**    **_Plaintiff's Testimony and Statements_**

At the January 2006 hearing, Plaintiff testified that prior to the alleged onset of his disability, his employer called him up after he had not been to work in "a year" and demanded that he report to work (R. 280). In response, he went to see his treating physician, Dr. Riess, who wrote up work restrictions. Plaintiff testified that his employer pushed him "way past" his limit and that, as a result, on August 12, 2004, his doctor told him to stop working entirely. At the April 2007 hearing, Plaintiff reiterated that he became disabled on August 12, 2004, when his employer refused to honor his 15-pound lifting restriction and his doctor ordered him to stop working (R. 311).

Plaintiff stated at the April 2007 hearing that he is in constant pain and that nothing makes the pain better (R. 313-314). He takes approximately five pain medications daily. When asked if those medications help, Plaintiff stated that his body "tells" him if he's forgotten to take them (R. 314). He claimed that side effects of the medications are blurred vision and dizziness and that, as a result, he has to rest for an hour or so after taking them (R. 314, 322-323).

At the April 2007 hearing, Plaintiff also testified that he cannot stand for more than 15 minutes, cannot sit for more than an hour at a time, cannot bend or stoop, cannot walk more than a 100 yards, and has trouble going up stairs (R. 314-315). He added that he has hardly any feeling in his fingers and hands, has trouble holding a cup of coffee, and has difficulty tying his shoes (R. 314-315, 325). He claimed that he is always fatigued and, due to pain, cannot sleep continuously at night (R. 312, 318). Plaintiff rated his pain an 8 out of 10 – with 10 being pain so severe that it would require going to the emergency room. He claimed this level of pain occurred a few days in a row every week, and that over time his pain is getting worse (R. 313).

For activities, he watches two hours of television a day, grooms himself, "tinker[s]" with cars, visits his parents at their home, cuts his lawn with a rider mower, eats out a couple of times a week, and goes to auto racing twice per year (R. 317-321). Plaintiff climbs up and down the stairs in his home twice a day and drove himself 40 miles to the hearing (R. 309, 315). He denied performing housework, preparing meals, shoveling snow, grocery shopping, vacuuming or dusting (R. 320-321).

At the January 2006 hearing, in contrast, Plaintiff acknowledged preparing his own meals, dusting, vacuuming, doing laundry, shoveling snow, washing the dishes, shopping for groceries, and going to the movies twice a month during the winter (R. 289-291). At the January 2006 hearing, Plaintiff also testified that he climbed up and down the stairs in his home five times a day and that he could drive about six miles per day but not "distances" (R. 275, 285).

## 2. *Medical Evidence*

The administrative record includes medical records from three treating physicians, Arthur Browne, D.O. (R. 140-144), Gerald Riess, M.D. (R. 152-166, 180-189, 205-206, 232-245), and Frank Judge, M.D. (R. 193- 203). In early October 1995, Plaintiff suffered an episode of vision loss, and an MRI scan, ordered by Dr. Judge, resulted in a diagnosis of multiple sclerosis ("MS") (R. 193-203). By March 1996, Plaintiff was doing "very well" with respect to his MS symptoms, and he was "back to normal." (R. 199). Notes from October 1996 mention Plaintiff's fatigue, primarily in the context of personal and family issues. Dr. Judge observed that, while fatigability is sometimes an issue with MS, he believed that, in Plaintiff's case, it was more likely caused by "psychological features" and advised counseling (R. 201-202). By the end of November 1996, Plaintiff was doing "okay" and further evaluation was unnecessary (R. 203).

In August 2003, Dr. Browne treated Plaintiff and noted that his MS symptoms were stable and that he was doing well on Motrin (R. 144). By February 2004, however, Plaintiff complained to Dr. Browne of a sudden onset of numbness in his hands, fingers and toes (R. 142).

In April 2004, Dr. Riess, a neurologist, treated Plaintiff and concluded that Plaintiff's symptoms were "most likely" due to a relapse of his MS, but he noted that the symptoms had improved "to some extent" (R. 163-164). By May 2004, Dr. Riess observed that Plaintiff's MS symptoms were stable and that Plaintiff had no new symptoms suggestive of MS, a conclusion that permeates the medical records from this time (May 2004) onward (R. 161-162).

At the same time that Dr. Riess was reporting that Plaintiff's MS was stable and that Plaintiff had no new symptoms of MS, Plaintiff began complaining to Dr. Riess of severe lower back pain (R. 163-164). In May 2004, Dr. Riess concluded, based upon an MRI, that Plaintiff's lower back pain was the result of radiculopathy, or disease of the nerve roots (R. 163-164). In addition to Motrin and Tylenol #3, Dr. Riess prescribed physical therapy and steroid injections (R. 161-162). Dr. Riess also prescribed Rebif to help manage Plaintiff's MS.

In July 2004, Dr. Riess continued to treat Plaintiff for lower back pain and ordered Plaintiff to restrict his activities (R. 159-160). Plaintiff's restrictions included no bending or stooping, no lifting of more than 15 pounds, no standing for more than 30 minutes, and no walking more than 300 yards. Due to a dispute with his insurance, Plaintiff had not yet started Rebif, physical therapy, or steroid injections, as previously ordered by Dr. Riess. While Dr. Riess found that Tylenol #3 and Motrin moderately controlled Plaintiff's pain symptoms, he felt that physical therapy and steroid injections would provide further relief. He also believed that Rebif should be included as part of Plaintiff's MS management.

Plaintiff returned to Dr. Browne in August 2004 – when Plaintiff asserts he became disabled (R. 141). Plaintiff complained to Dr. Browne of severe lower back pain after "overdoing" it at work. Dr. Browne noted Plaintiff's prescriptions for Tylenol #3 and Motrin and additionally prescribed Prednisone. Dr. Browne reported that Plaintiff was not to return to work for one week and, thereafter, to return to work with Dr. Riess's restrictions.

In October 2004, Plaintiff continued to complain of severe back pain to Dr. Riess (R. 157-158). Plaintiff had started steroid injections but felt they were ineffective. He had also started taking Rebif, which Dr. Riess ordered him to continue. In addition to Tylenol and Motrin, Dr. Riess additionally prescribed Neurontin as a coanalgesic to the Tylenol #3 and noted that Plaintiff's physical therapy would begin soon. Plaintiff denied any side effects from his medications. Dr. Riess again observed that Plaintiff's MS was stable with no new symptoms.

Over the next eight months, Dr. Riess continued to report complaints of back pain, no side effects from medications, and stable MS (R. 157-158, 156, 154-155, 152-153, 181-182). By March 2005, Plaintiff was complaining that simple activities like stooping, bending, and lifting worsened his back pain (R. 152-153, 181-182). Dr. Riess concluded that Plaintiff could return to work but only with work restrictions, "likely permanent," of no bending or stooping and no lifting more than 15 pounds (R. 152-153).

In June 2005, Dr. Riess again noted that Plaintiff's MS was stable, and added that he had a "minimal degree of disability due to this disease" (R. 181). Dr. Riess, however, described Plaintiff's radiculopathy as "clearly bothersome," the cause of considerable work restrictions and he planned further testing.

Physical therapy notes from this time period – the end of 2004 through early 2005 – indicate that when Plaintiff began physical therapy he reported that driving was so painful it

rated a 9 out of 10 (R. 146-149).  By his discharge in March 2005, however, Plaintiff was stating

a desire to return to work.

An MRI of the spine in June 2005 revealed mild disc desiccation, or drying of the discs

(R. 177-178).  An EMG in August 2005 confirmed the radiculopathy diagnosis (R. 180).

The record also contains the June 8, 2005, opinions of State Agency Enhanced Examiner,

C.R. Kalmar (R. 168-175).  Examiner Kalmar found that Plaintiff could frequently lift 10

pounds, sit for a total of about 6 hours in an 8 hour workday, and is limited in his lower

extremities (R. 169).  Examiner Kalmar also found that Plaintiff could occasionally climb,

balance, stoop, kneel, crouch and crawl, but had no manipulative, visual or communicative

limitations  (R. 170-172).

Fatigue was first reported by Dr. Riess in September 2005 in response to a questionnaire

prepared by Plaintiff's counsel (R. 188-189, 205-206).  Dr. Riess's questionnaire responses state

that he treated Plaintiff for MS, that Plaintiff's prognosis was "poor," and that fatigue and

walking prevented Plaintiff from working (R. 188-189, 205-206).  He restricted Plaintiff's

activities to 10 minutes of walking, 20 minutes of standing, and 20 pounds of lifting (R. 206).

He additionally found that Plaintiff had limited manual manipulation.

Plaintiff returned to Dr. Riess in November 2005 and continued to treat with him through

2006 (R. 232-242).  Plaintiff's MS remained stable with no side effects from his medications.

During this period Dr. Riess continued to work with Plaintiff on controlling his back pain.  In

November 2005, Dr. Riess began prescribing Flexeril, in addition to Plaintiff's other

medications, in an effort to try to better control his pain (R. 241-242).  By January 2006, Plaintiff

reported that his pain symptoms were unchanged but that Flexeril helped his sleep (R. 239-240).

Dr. Reiss ordered further steroid injections for Plaintiff's back pain.

In February 2006, Plaintiff reported some improvement from the steroid injections (R 237-238). Dr. Riess prescribed Ultram, ordered further steroid injections, and advised Plaintiff to resume Rebif, which Plaintiff had stopped taking following a dispute with his insurance company (R. 237-238). By May 2006, Plaintiff finally reported that the steroid injections were effective, and Dr. Riess advised Plaintiff to continue with his previously prescribed medications, which included Motrin, Rebif, Ultram and Neurontin (R. 235-236). Plaintiff's prescription for Tylenol #3 was briefly suspended, after another doctor raised a concern over its addictiveness (R. 235-236). In the last of the August and November 2006 treatment notes in the administrative record Dr. Riess reported that Plaintiff's back pain was "well controlled" and "very well controlled," respectively (R. 232-234).

At the request of the Administration, the claimant participated in a medical consultative examination on May 21, 2007, with Mary C. Wood, M.D. (R. 246-251). Plaintiff's chief complaints were multiple sclerosis and arthritis of the back. Plaintiff said that he had fatigue from his multiple sclerosis and from his weak back. Sometimes he would need to take two·naps during the day. He had received IV steroids five times in the past 12 years. Plaintiff's back pain occasionally radiated to the left hip and other times to the right hip. He could stay in one position for only so long. He added that he was diagnosed with optic neuritis from multiple sclerosis. Since then there had not been any recurrent blindness, except blurred vision and occasional numbness and weakness of the arms and legs. He had trouble going up stairs, but no problem going down stairs. His neurologist gave him a 15 pound restriction on lifting and no stooping, squatting or climbing ladders. His medications included Motrin, 800 milligrams, three times a day; Neurontin, 300 milligrams, two in the morning "and three at night; Trarnadol, 50 milligrams, two at three times a day; Flexeril, 10 milligrams, three times a day; Tylenol #3 as

needed; and Rebif injections every day and a half.

On examination, Dr. Wood stated that Plaintiff did not appear acutely ill or in any acute distress. He was ambulatory with no assistive device. Plaintiff's diagnoses included multiple sclerosis and degenerative disc disease of the lumbosacral spine. Dr. Wood indicated that Plaintiff's multiple sclerosis seemed to be stable. Visual acuity: far vision without glasses - 20/40 in both eyes; near vision without glasses - 20/50 in both eyes. Dr. Wood stated that Plaintiff had no impairments affecting Plaintiff's hearing or vision. The neurological examinations showed a generalized increase in reflexes of his upper and lower extremities without significant motor deficit. Romberg test was negative and he did not have ataxia. Gait was normal. The motion of the lumbosacral spine was limited. There was no nerve root compression.

Dr. Wood completed a residual functional capacity assessment and stated that Plaintiff could lift/carry up to 20 pounds occasionally (R. 246-261). In an eight hour workday, Plaintiff could sit for four hours and stand/walk about two hours. He could occasionally reach, handle, finger, feel, and push/pull with either hand, and occasionally use foot controls with either foot. He could not stoop, climb stairs and ramps, ladders, or scaffolds, but he could occasionally balance, kneel, crouch, and crawl. He should not work around unprotected heights or moving mechanical parts.

### 3. *Vocational Evidence*

VE Steele indicated that Plaintiff's past work as prototype technician and automotive mechanic is considered skilled work (R. 330). She stated further that this work would either be performed at the medium or heavy exertional level depending on the work setting. Plaintiff's

work as an industrial crane operator is classed as semiskilled to skilled in terms of vocational preparation and is performed at the heavy or "very heavy" exertional level.

The ALJ asked the vocational expert to consider a hypothetical individual of Plaintiff's age, education, and work experience who could perform sedentary work at an unskilled level that did not involve lifting more than 15 pounds or climbing ladders, ropes, or scaffolds and that would allow sitting every 45 to 60 minutes for five to ten minutes, standing every hour, and occasional balancing, kneeling, crouching, crawling, bending, twisting, climbing of stairs and ramps, and use of foot controls (R. 329-330). The vocational expert testified that such an individual could perform work as a cashier (with approximately 7,200 of those positions in the lower peninsula of the State of Michigan), information/reception clerk (with approximately 3,200 of those positions in the lower peninsula of the State of Michigan), and sorter/packager (with approximately 1,400 of those positions in the lower peninsula of the State of Michigan) (R. 331).

The vocational expert testified that the addition of no bending or stooping to the hypothetical would have no impact on these jobs (R. 331). In contrast, if additional restrictions were added to account for the fatigue, dizziness, and blurred vision claimed by Plaintiff, no such jobs would exist for such an individual (R. 332). The vocational expert further testified that the characteristics of the jobs identified were consistent with those published in the *Dictionary of Occupational Titles*.

### 4.  *ALJ Hartman's July 27, 2007, Decision*

ALJ Hartman found that Plaintiff met the insured status requirement of the Social Security Act through December 31, 2009 (R. 21). Moreover, Plaintiff had not engaged in substantial gainful activity since August 12, 2004, his alleged onset date. The ALJ further found

the medical evidence establishes that Plaintiff has the following severe impairments: multiple sclerosis and degenerative disc disease.  Yet, ALJ Hartman found that Plaintiff did not have an impairment of combination of impairments that met or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. 25).

After considering the evidence of record, the ALJ determined that Plaintiff's medical impairments could reasonably be expected to produce the alleged symptoms, but that the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible (R. 26).  ALJ Hartman noted that in 2006, Plaintiff underwent epidural steroid injections and in follow-ups with Dr. Riess in August 2006 and again in November 2006.  The related medical records indicate that Plaintiff had no symptoms suggestive of MS and that his back pain had been reasonably controlled.  No changes were made in the Plaintiff's treatment.  The ALJ further noted that during the January 2006, hearing, Plaintiff testified that he cares for his own personal needs, prepares his own meals and does household chores, such as dusting, mopping, vacuuming, dishes, laundry, grass mowing and show shoveling.  Yet, during the April 30, 2007, hearing, Plaintiff testified that he stopped fixing his own meals when his daughter moved in (R. 26-27).  He does not do any cleaning.  He mows on the tractor, but does not shovel snow.  He continues to eat out a couple times a week and "goes to auto racing a couple times a week (sic)."[1]  Plaintiff added that he does not have any problems with his vision, besides needing glasses or contacts.

As for the opinion evidence, the ALJ declined to give the opinion of Dr. Riess controlling weight.  ALJ Hartman indicated that Dr. Riess' statement that Plaintiff's prognosis was poor was completed in September 2005, and further follow-up notes through at least November 2006 show

---

[1] Plaintiff testified to two times a year (R. 320).

11

that Plaintiff had no symptoms suggestive of MS and his back pain was reasonably controlled (R. 27). Furthermore, in March 2005, Dr. Riess added that without significant restrictions, Plaintiff would be unable to perform his normal job activities and would require disability. ALJ Hartman stated that she essentially agreed with this statement that Plaintiff could not return to his "normal" job activities, but felt that there are a significant number of other jobs that Plaintiff could perform. ALJ Hartman noted that although fatigue was mentioned as a limiting factor in 1996, Plaintiff continued to work and there is no medical evidence of record to support a finding that Plaintiff's current fatigue is worse than it was in 1996.

ALJ Hartman also considered the opinions of Dr. Wood and of the State Agency Examiner, C.R. Kalmar, from June 8, 2005. The ALJ found that the opinion of the State Agency Examiner was both conclusory and unsupported. Furthermore, ALJ Hartman indicated that new evidence has been submitted since the DDS determination which supports her functional capacity assessment of the Plaintiff. The ALJ also did not give controlling weight to Dr. Wood's opinion that Plaintiff cannot climb stairs as Plaintiff told Dr. Wood, and the ALJ during hearings, that although he had some trouble going up stairs, he had no problems going down stairs. ALJ Harman found that there is additionally no medical evidence in the record to support Dr. Wood's conclusion that Plaintiff could only sit a total of four hours in a workday. Moreover, the ALJ opined that there was no medical evidence to support the Plaintiff's report of dizziness. The ALJ concluded that the medical evidence would support sitting six hours and limiting standing/walking to a total of two hours. Although Dr. Wood indicated that Plaintiff could never perform stooping, the ALJ took "note that the vocational expert testified that the additional restrictions of no bending and no stooping would not change the number of jobs available."

The ALJ concluded that Plaintiff has the residual functional capacity to perform sedentary work except Plaintiff needs a sit/stand option to change positions at will every 45 to 60 minutes for 5 to 10 minutes. Plaintiff cannot climb ladders, ropes, or scaffolds but can occasionally climb stairs, balance, kneel, crouch, crawl, bend, twist and operate foot controls (R. 25). The ALJ further concluded that Plaintiff has at least a high school education, is unable to perform any past relevant work, and should be considered a younger individual on the alleged onset date, which is defined as an individual aged 45-49 (R. 28).

Given Plaintiff's age, education, work experience, and residual functional capacity, ALJ Hartman concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. In so finding, the ALJ consulted a vocational expert to determine whether a significant number of jobs existed to accommodate Plaintiff's abilities and limitations (Step 5). ALJ Hartman notes that the vocational expert testified that given all the factors described by the ALJ, Plaintiff would be able to perform the requirements of representative occupations, such as cashier (7,200 jobs), information clerk (3,200 jobs) and sorter packager (1,400 jobs) (R. 29). The VE indicated that a restriction of no bending or stooping would have no impact on the jobs identified. Accordingly, it was the decision of ALJ Hartman that Plaintiff has not been under a disability within the meaning of the Social Security Act at any time from August 12, 2004, through the date of her decision.

## II.   ANALYSIS

### A.   Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and*

*Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v.

Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

      If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.  A response to a flawed hypothetical

question is not substantial evidence and cannot support a finding that work exists which the

Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779

(6th Cir. 1987) (hypothetical question must accurately portray Plaintiff's physical and mental

impairments); *Cole v. Sec'y of Health and Human Servs*., 820 F.2d 768, 775-76 (6th Cir. 1987)

(Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may

constitute substantial evidence only if the questions posed accurately portray the Plaintiff's

impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must

state with precision the physical and mental impairments of the Plaintiff."); *Myers v.

Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir.

1975).

**B.**     **Factual Analysis**

In his motion for summary judgment Plaintiff argues that ALJ Hartman erred as a matter of law in both her analysis of the treating physician's opinion and her analysis of Plaintiff's alleged inability to stoop on the erosion of the sedentary work base.  As such, Plaintiff contends ALJ Hartman's decision is not supported by substantial evidence and that remand is required to correct these errors.

**1.**     **Plaintiff's Credibility and Plaintiff's Ability to Stoop**

In determining Plaintiff's residual functional capacity, the ALJ discussed, in detail, Plaintiff's April 2007 testimony regarding his pain and limitations and contrasted that with the medical evidence and his January 2006 testimony (R. 18-29).  Subjective evidence is only considered to "the extent . . . [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)).  The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record.  *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  The issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion.  *Kirk v. Secretary of health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons.  S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific.  The ALJ must say more than the testimony is not credible.  *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount

the medical evidence and claimant's daily activities and then, without analysis, summarily

conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory

findings to substantiate the claimant's testimony regarding pain.  *Id*. at 1039.

Here, the ALJ used a two-step process to evaluate Plaintiff's symptoms (R. 25).  *See*

*Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ determined if

there was an underlying medically determinable physical condition or mental impairment that

could reasonably be expected to produce Plaintiff's pain.  *See* 20 C.F.R. §§ 404.1529(b) and

416.929(b)(describing need for medically determinable impairment that could reasonably be

expected to produce the alleged symptoms); *Rogers*, 486 F.3d at 247.  Second, the ALJ

determined whether Plaintiff's statements about the intensity, persistence, and functionally

limiting effects of the symptoms were substantiated by the objective medical evidence and

credible based upon the entire record. *See* 20 C.F.R. § 404.1527(c).  The ALJ concluded that,

while Plaintiff's impairments of MS and degenerative disc disease could reasonably be expected

to produce the symptoms Plaintiff alleged, his statements regarding his symptoms were not

substantiated by objective medical evidence, and the other evidence of record (R. 25-27).

The ALJ considered Plaintiff's medication, possible side effects, and treatment

other than medication, and testimony under 20 C.F.R. § 404.1529(c)(3), and these factors

support her credibility finding.  The ALJ noted that Plaintiff testified that he had constant, severe

back pain, but that the treating records throughout 2006 and into November 2006 – the final

treating records in the administrative record – state that Plaintiff had no symptoms suggestive of

MS and that epidural injections, in combination with other medications, resulted in reasonable

control of his back pain (R. 26).  The ALJ further noted that no changes had been made to

Plaintiff's treatment since 2006.  The ALJ also observed that Plaintiff testified to various side

effects from his medications, such as blurred vision and dizziness (R. 27), but that the medical records were devoid of any mention of these claims (R. 20-27).

The ALJ further explained that at the first hearing in January 2006, Plaintiff testified to dusting, mopping, vacuuming, mowing the grass, shoveling snow, shopping for food, going to the movies and sporting events, and preparing his own meals (R. 26-27).  By the time of the second hearing in April 2007, a period when Plaintiff's condition was improving according to the medical evidence, Plaintiff claimed to have stopped performing many of the household duties about which he previously testified, but acknowledged continuing to "tinker[]" with cars and eating out (R. 26-27).  The ALJ also noted Plaintiff's testimony that he climbed up and down the stairs at his home (R. 24, 27).  The ALJ justifiably considered these activities in contrast to his claim of disabling pain.  *See* 20 C.F.R. § 404.1529(c)(3)(I); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Considering Plaintiff's testimony and the medical evidence, the ALJ found that Plaintiff was restricted to sedentary work as recommended by Dr. Riess – and not the "normal" and more physically demanding work of his previous work (R. 20-27).  The ALJ further found that Plaintiff could occasionally bend, crawl, and twist, among other activities, but could not climb ladders or ropes, and required a sit/stand option to change positions every 45 to 60 minutes.

Plaintiff contends that the ALJ, instead, should have found that Plaintiff can never stoop. As the ALJ noted, however, there is a disconnect between Plaintiff's statements regarding his limitations and pain, on the one hand, and the medical evidence and his testimony regarding his activities, particularly in 2006, on the other – during which, at least a portion of that time, Plaintiff reported shoveling snow, vacuuming, and mowing his lawn and the medical evidence showed asymptomatic MS, well-controlled back pain, and unchanged medical treatment (R.

17

20-29).  The evidence, therefore, supports the ALJ's determination as to Plaintiff's credibility

and resulting residual functional capacity finding, excluding a stooping limitation.  *See Buxton*,

246 F.3d at 772-73 (stating that substantial evidence presupposes a zone of choice within which

the ALJ can go either way without interference by the courts).

Plaintiff, however, argues, not only that substantial evidence demands a finding of

Plaintiff's inability to stoop, but also that an inability to stoop necessitates a finding of disability.

 As discussed above, substantial evidence supports the ALJ's credibility determination, and

the ALJ's subsequent residual functional capacity determination excluding a stooping limitation.

Yet, even if the evidence demanded that the ALJ find a complete inability to stoop, which it

does not, Social Security Ruling 96-9p does not require a finding of disability in every case.[2]  To

the contrary, it states that where there is a complete inability to stoop, the Medical-Vocational

Guidelines cannot direct the determination because the Guidelines presume an individual has the

residual functional capacity for the full range of sedentary work.  *See* SSR 96-9p

<http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-09-di-01.html>.

In the case of a complete inability to stoop, Social Security Ruling 96-9p directs the

decision maker to consult a vocational expert.  *See id.*  It states, "Consultation with a vocational

resource may be particularly useful for cases where the individual is limited to less than

occasional stooping." *Id.*  Social Security 96-9p, therefore, does not direct a finding of disability

in all cases, but rather consultation with a vocational expert.  *See id.*  Consistent with the

language of 96-9p, the Seventh Circuit rejected the argument that 96-9p requires a finding of

disability, and held, instead, that an inability to stoop requires consultation with an expert

witness.  *See Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

---

[2] SSR 96-9p notes that an inability to stoop for one limited to unskilled sedentary work
"would usually" result in a disability finding.

While the ALJ ultimately found that Plaintiff could stoop, she nonetheless consulted a vocational expert to determine the effect of Plaintiff's limitations, as expressed in the residual functional capacity (R. 28, 329-332). The vocational expert concluded that a person of Plaintiff's age, education, work experience, and residual functional capacity could perform work as a cashier, information clerk, and sorter/packager (R. 29, 329-332). The ALJ then asked the vocational expert what effect, if any, the limitations of no stooping or bending would have on the occupations identified, and the vocational expert replied that such restrictions would have no effect on these job (R. 29, 329-332). Thus, even though the ALJ ultimately rejected a stooping limitation as part of Plaintiff's residual functional capacity, the ALJ considered such a limitation, asked the vocational expert about it, and learned that it would have no effect on the occupations identified (R. 29, 329-333).

Substantial evidence supports the ALJ's credibility finding in this case. Yet, even if the ALJ should have included a stooping restriction, the testimony of the vocational expert reveals that the inclusion of a stooping restriction would have had no effect on the disability determination.

### 2.    Plaintiff's Treating Physician

Plaintiff argues that the ALJ erred as a matter of law in her analysis of treating physician Riess' opinion. It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the

opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See also*, S.S.R. 96-2p.

Yet, the conclusion of whether a Plaintiff is "disabled" is a decision reserved to the Commissioner to decide (R. 19). 20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2). And, "[w]e will not give any special significance to the source of an opinion on an issue reserved to the Commissioner." *Id.* at §§ 404.1527(e)(3), 416.927(e)(3). Here, the ALJ weighed Dr. Riess' opinion in accordance with controlling law, and he reasonably determined Plaintiff could do a range of sedentary work (R. 25). The regulations and case law recognize that the opinion of a physician, including a treating physician, is entitled to great weight only if it is supported by adequate medical data, including medical signs and laboratory findings, and does not conflict with other evidence. 20 C.F.R. § 404.1527(d)(2)(3)(4); *Walters*, 127 F.3d at 530.

Here, the ALJ discussed the treating records of Dr. Riess, Plaintiff's neurologist, as well as Plaintiff's other doctors (R. 20-29). The ALJ accepted the MS and degenerative disc disease

diagnoses and, while she incorporated many of Dr. Riess's opinions into the residual functional capacity determination, she found that Dr. Riess's opinions were not controlling and explained her reasons.  She observed that Dr. Riess, in 2005 and 2006, and Dr. Wood, in 2007, described Plaintiff's MS as stable and asymptomatic (R. 20-29, 181-184, 232-242).  She noted that beginning in 2006 the records indicated that Plaintiff began experiencing relief from back pain as a result of epidural shots (R. 22-23, 27, 235-238).  She also noted that the evidence showed that treatment for Plaintiff's back pain remained unchanged since at least 2006 (R. 26, 232-233).  ALJ Hartman further observed that Dr. Riess's treating records in November 2006 – the last of the treating records – stated that Plaintiff's back pain was well-controlled (R. 23, 26, 232-233).  She noted that Plaintiff had reported feeling fatigued back in 1996 but that Plaintiff continued to work, notwithstanding that complaint, and that no evidence showed that the fatigue continued or worsened since that time (R. 27, 201-202).  The ALJ also observed that when Plaintiff completed physical therapy in March 2005 he stated a desire to return to work (R. 21, 146-149).

Accordingly, the ALJ found Dr. Riess's September 2005 questionnaire responses – stating that Plaintiff's MS prognosis was poor, that he was unable to work due to fatigue, that he had difficulty with manual manipulation, and that he could not walk more than 10 minutes or stand more than 20 minutes – unsupported by the record (R. 27, 188-189, 205-206).  Dr. Riess's responses to the questionnaire were contradicted by his own records, dating before and after September 2005, in which he stated that Plaintiff's MS was stable, that Plaintiff had no symptoms suggestive of MS, and that his back pain was improving and reasonably controlled (R. 27, 181-182, 232-233, 237-238).  Consequently, the ALJ properly concluded that Dr. Riess's opinions were not entitled to controlling weight, as they were inconsistent with Dr. Riess's own treating notes (R. 25-27).

The ALJ acknowledged and agreed with Dr. Riess's conclusion that Plaintiff was unable to return to his normal work without significant restrictions, but she disagreed with his conclusion that because of those restrictions, Plaintiff was disabled (R. 27, 183-184).  Where Dr. Riess's opinions were consistent with the record, such as the lifting restriction, the ALJ adopted them; but, where they were inconsistent, such as Dr. Riess's disability conclusion, they were rejected (R. 27, 183-184).  Plaintiff argues that the ALJ should have adopted the manual manipulation and fatigue limitations set forth in the September 2005 questionnaire responses Yet, Plaintiff has not cited any treating records evidencing these complaints during the relevant period.  Although Dr. Riess mentioned fatigue and manual manipulation limitations in the September 2005 questionnaire responses, these references are aberrant and unsupported elsewhere in the medical evidence (R. 188-189, 205-206).  Plaintiff also argues that the ALJ's statement that Dr. Riess's opinions are not controlling is conclusory.  Yet, the ALJ devoted considerable attention to Dr. Riess's treating notes, discussing them in detail and explaining at length the reasons she did not accept these as controlling (R. 20-27).

Additionally, Plaintiff, citing *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004), claims that the ALJ failed to give "good reasons" for not giving weight to Dr. Riess's opinions in violation of 20 C.F.R. § 404.1527(d)(2).  In fact, the ALJ's decision reveals that the ALJ considered Dr. Riess's opinion and neither accepted every opinion nor rejected every opinion (R. 20-27).  The ALJ had to reconcile years of medical treatment, where Plaintiff's conditions and symptoms were constantly changing, against Plaintiff's own statements to his doctors and to the ALJ at the two disability hearings.  The ALJ, then, had to weigh all of that evidence against Plaintiff's statements about his activities and the most recent treating records in

the administrative record – showing that Plaintiff's MS was asymptomatic, that his back pain was well-controlled, and that his medical treatment was unchanged since 2006 (R. 20-29).

Where Dr. Riess's opinions were supported by the medical evidence, particularly the most recent medical evidence, and Plaintiff's testimony – such as the lifting restriction – the ALJ adopted them (R. 20-27). Where those opinions were not supported by the medical evidence and Plaintiff's testimony – such as the stooping and fatigue limitations – the ALJ provided context, discussing the medical records and Plaintiff's testimony regarding his activities, and excluded them. In sum, this is not a case, as in *Wilson*, where the ALJ rejected a treating doctor's findings without comment. *See Wilson*, 378 F.3d at 545. To the contrary, the ALJ discussed Dr. Riess's opinions, accepting some and rejecting others, and in the context of Dr. Riess's most recent treating records from 2006 and Plaintiff's own statements.

Substantial evidence supports the finding that Dr. Riess's opinions were not entitled to controlling weight. Even if it were true, as Plaintiff contends, that the ALJ failed to articulate "good reasons" for not adopting each and every opinion of Dr. Riess, the ALJ's detailed discussion of Dr. Riess's opinions, in conjunction with Plaintiff's testimony, are evidence that, at the very least, the ALJ met the goal of section 1527(d)(2), demonstrating thoughtful consideration of often contradictory medical evidence and adopting those opinions that were consistent with the record as a whole. *See Wilson*, 378 F.3d at 544.

## III.    RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in

28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard*

*v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638

F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others

with specificity, will not preserve all the objections a party might have to this Report and

Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir.

1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20) pages in

length unless by motion and order such page limit is extended by the Court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.


Dated: June 19, 2009                                    s/ Steven D. Pepe
Ann Arbor, MI                                           United States Magistrate Judge


Certificate of Service


The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on June 19, 2009.


                                        s/Jermaine Creary
                                        Interim Case Manager